McKEAGUE, Circuit Judge, concurring in part and dissenting in part.
The majority tells a story of intentional poisoning based on a grossly exaggerated version of plaintiffs' allegations. The complaint tells an entirely different story. It is a story of a series of discrete and discretionary decisions made by a variety of policy and regulatory officials who were acting on the best information available to them at the time. In retrospect, that information turned out to be grievously wrong. The result is what has become known as the Flint Water Crisis. The question this case presents is not whether the collective result of the officials' actions-the Water Crisis-caused any harm. It did. The question is, rather, whether any official's discrete *942 decisions or statements, which in any way caused or contributed to the Crisis, violated a substantive due process right to bodily integrity. By answering that question with, "obviously, yes," the majority extends the protections of substantive due process into new and uncharted territory and holds government officials liable for conduct they could not possibly have known was prohibited by the Constitution. In doing so, the majority unfairly denies defendants protection from suit under the doctrine of qualified immunity.
As in all cases dealing with the defense of qualified immunity, it is plaintiffs' burden to establish, first, that the defendants violated a constitutional right and, second, that the right was clearly established at the time the challenged conduct took place. Ashcroft v. al-Kidd , 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). I have serious doubts about whether plaintiffs carried their burden at the first prong of the analysis. I am certain they failed to carry their burden at the second. The majority reaches the opposite conclusion by building on a factual narrative of its own invention.
To place the qualified-immunity analysis on firmer footing, I begin with a recitation of the allegations as told by plaintiffs in their complaint. I then turn to qualified immunity's two prongs. As to the first, I doubt that plaintiffs allege that any defendant deprived them of a Fourteenth Amendment substantive-due-process right-both because the conduct actually alleged in the complaint does not appear to be conscience-shocking and because the Due Process Clause has never before been recognized as protecting against government conduct that in some way results in others being exposed to contaminated water. But even if plaintiffs have alleged the violation of a recognized due process right, their claim nonetheless fails at prong two of the qualified-immunity analysis, which asks whether the right was clearly established. The mere fact that no court of controlling authority has ever recognized the type of due process right that plaintiffs allege in this case is all we need to conclude the right is not clearly established. Accordingly, qualified immunity must shield each defendant from suit.
Before moving to the analysis, I note several points of agreement with the majority opinion. First, I join the majority in rejecting the City of Flint's argument that it is entitled to Eleventh Amendment immunity from plaintiffs' suit because the State of Michigan's takeover of the City of Flint, pursuant to Michigan's "Emergency Manager" law, transformed the City into an arm of the state. Additionally, I agree that plaintiffs fail to state a Fourteenth Amendment claim against Michigan Department of Health and Human Services (MDHHS) employees Nick Lyon, Eden Wells, Nancy Peeler, and Robert Scott; and Michigan Department of Environmental Quality (MDEQ) director Daniel Wyant. That is where my agreement ends, however. I respectfully dissent from the denial of qualified immunity for Flint Emergency Managers Darnell Earley and Gerald Ambrose; Flint's Director of Public Works Howard Croft; and MDEQ employees Liane Shekter-Smith, Stephen Busch, Michael Prysby, and Bradley Wurfel.
I
I begin with a review of the facts. Because this case comes before us on appeal from a motion to dismiss for failure to state a claim, I accept all factual allegations as true and construe them in the light most favorable to plaintiffs. Linkletter v. W. & S. Fin. Grp., Inc. , 851 F.3d 632, 637 (6th Cir. 2017).
The Flint Water Crisis began when the City of Flint, undergoing extreme financial distress, came under the leadership of a *943 succession of "Emergency Managers"-temporary city managers appointed by the governor to "act for and in the place and stead of the governing body and the office of chief administrative officer of the local government." M.C.L. § 141.1549(2). One of the City's Emergency Managers was Edward Kurtz. In 2013, Kurtz made a critical fiscal decision that set the City on a path toward the Flint Water Crisis. With the approval of the State of Michigan's treasurer, Kurtz terminated a decades-long contract for water services from the Detroit Water and Sewerage Department (DWSD) and ordered Flint to join the newly-formed and more affordable Karegnondi Water Authority (KWA). The KWA was not yet functional, however. So Kurtz had to choose an interim source of Flint's drinking water. He determined that the best temporary source, from a budgetary standpoint, was the Flint River, treated at the City's own, and then-idle, water treatment plant. He notified the DWSD that Flint would soon cease receiving water from the DWSD.
Before the switch was finalized, Darnell Earley took over as Emergency Manager, assuming the position in November 2013. The City officially switched to the Flint River in April 2014. For decades prior, the Flint water treatment plant was designated for emergency use only. A 2011 "feasibility report" concluded that it would take extensive upgrades to bring it in compliance with "applicable standards" for use as a permanent water source. Plaintiffs allege that Earley "rushed" the switch to meet a "self-imposed" and "aggressive" deadline, without ensuring that Flint's water treatment plant was ready to properly treat Flint River water, and that he did so for the purpose of cutting costs. But they also assert that, at some point before the April 2014 switch, Flint hired an engineering firm-Lockwood, Andrews, & Newman (Lockwood)-"to prepare Flint's water treatment plant for the treatment of new water sources, including both the KWA and the Flint River." Even though the Flint River water was highly corrosive, plaintiffs allege that Lockwood did not advise the City to set water quality standards or implement corrosion control at the water treatment plant prior to using the River as a drinking water source.
Neither did the MDEQ-the state agency primarily responsible for ensuring compliance with federal and state safe drinking water laws. Relevant here, the MDEQ was tasked with ensuring Flint complied with the federal Lead and Copper Rule. That Rule generally requires public water systems to monitor and treat lead and copper levels in drinking water. 40 C.F.R § 141.80, et seq . The MDEQ believed, erroneously as it turns out, that the Rule allowed Flint's water treatment plant to begin distributing Flint River water and then conduct two rounds of six-month testing before determining what method of corrosion control to use to treat the water. So in April 2014, the City began distributing the Flint River water to residents without first implementing corrosion control treatment. Around the time of the switch, the director of Flint's Department of Public Works, Howard Croft, publicly announced that the City's testing proved the water was safe and "of the high quality that Flint customers have come to expect."
Soon after the transition, however, problems emerged. Residents complained of oddly smelling and discolored water. In October 2014, General Motors stopped using the City water at its engine-manufacturing plant out of fear that high levels of chloride would cause corrosion. Then, after the City attempted to disinfect the water, it discovered trihalomethanes-a potentially toxic byproduct caused by attempting to disinfect the water. That discovery prompted the City to mail a notice to its customers explaining that the City was in *944 violation of the Safe Drinking Water Act but that the water was safe to drink for most people with healthy immune systems. Additionally, plaintiffs say that "[a]s early as January of 2015, the State of Michigan provided purified water coolers at its Flint offices in response to concerns about the drinking water."
On January 9, 2015, the first apparent concerns of lead in Flint's drinking water began to emerge. On that day, The University of Michigan-Flint discovered lead in campus drinking fountains. It is unclear from the complaint whether that discovery was publicized and thus whether any City or State official involved in testing or distributing Flint's water knew about the discovery.
Also around January 2015, and largely in response to citizen complaints, Flint hired another engineering firm-Veolia North America, LLC (Veolia)-to review the City's water quality. Veolia completed a "160-hour assessment of the treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The firm issued a final report in March, in which it concluded that Flint was in "compliance with State and Federal water quality regulations, and based on those standards, the water [was] considered to meet drinking water requirements." Additionally, it stated that discolorations in the water "raise[d] questions" but that the water remained safe to drink.
Around that time, another Emergency Manger, Gerald Ambrose, took over the City's operations. On January 12, 2015, the day before Ambrose assumed his Emergency Manager role, the DWSD offered to waive a 4-million-dollar reconnection fee if the City of Flint resumed using its services. Ambrose declined the offer. Then, in late March, Flint's City Council voted 7-1 to resume services with the DWSD. Ambrose rejected the vote, calling it "incomprehensible."
In the meantime, several MDEQ employees were having internal discussions about Flint's water problems. Liane Shekter-Smith, MDEQ's Chief of the Office of Drinking Water and Municipal Assistance, emailed other MDEQ employees to suggest that the Flint River water was "slough[ing] material off of pipes" in the distribution system rather than "depositing material or coating pipes[.]" She opined that "[t]his may continue for a while until things stabilize."
Soon, an EPA employee became involved in the discussion as well. Miguel Del Toral, the EPA's regional drinking water regulations manager, reached out to the MDEQ on February 27, 2015, to voice his concerns about the possibility of elevated lead levels. Del Toral informed Michael Prysby, an MDEQ engineer, that the MDEQ's specific method for testing lead levels in Flint residents' tap water may be producing test results that underestimated lead levels. He also asked whether the water treatment plant was using optimized corrosion control, which he noted was "required" to be in place. That same day, Stephen Busch, an MDEQ District Supervisor in Lansing, responded to Del Toral stating that the water treatment plant had an "optimized corrosion control program." Two months later, an unidentified individual from the MDEQ informed the EPA that it had no optimized corrosion control treatment in place.
In April 2015, Del Toral again reached out to the MDEQ, this time issuing a memorandum that expressed concern with the lack of corrosion control and Flint's water testing methods. He also told MDEQ employees Busch and Prysby that he believed the MDEQ's sampling procedures did not properly account for the presence of lead service lines. Therefore, *945 Del Toral said he "worried that the whole town may have much higher lead levels than the compliance results indicated[.]" According to plaintiffs, the MDEQ "ignored and dismissed" Del Toral's concerns.
A few months later, plaintiffs say that Busch "claimed that 'almost all' homes in the pool sampled for lead in Flint had lead services lines," even though this was untrue. Plaintiffs do not indicate to whom Busch made that statement. Later in July, a reporter broke a story announcing that Flint's water was contaminated with lead, citing Del Toral's April 2015 memorandum. In response, Bradley Wurfel, MDEQ's Communications Director, publicly stated that "anyone who is concerned about lead in the drinking water in Flint can relax."
That same month, the EPA and the MDEQ had a conference call to discuss MDEQ's compliance with the Lead and Copper Rule. According to plaintiffs, the EPA pushed for Flint to use optimized corrosion control, but the MDEQ insisted that doing so was "unnecessary and premature." In a follow-up email, MDEQ employee Shekter-Smith asked the EPA to provide a written concurrence that the City was in compliance with the Lead and Copper Rule.
Also in July, MDEQ employees exchanged a series of internal emails discussing how water tests performed by outside sources, which showed that Flint's drinking water had impermissibly high lead levels, compared with the MDEQ's own water testing results, which showed lower lead levels. When a report by a Virginia Tech professor revealing high lead levels surfaced in September 2015, Wurfel made public statements challenging the report and asserting that Flint's drinking water remained in compliance with federal and state laws. During this time, other MDEQ employees maintained that Flint was not required to use corrosion control until unacceptably high levels of lead had already appeared in the water, which they believed was not yet the case.
Later in September, Croft emailed "numerous officials" to report that the City of Flint had "officially returned to compliance with the Michigan Safe Drinking Water Act" and that it had "received confirming documentation from the [M]DEQ" to that effect. He explained that "[a]t the onset of our plant design, optimization for lead was addressed and discussed with the engineering firm and with the [M]DEQ. It was determined that having more data was advisable prior to the commitment of a specific optimization method. ... We have performed over one hundred and sixty lead tests throughout the city since switching over to the Flint River and remain within EPA standards."[1]
The MDHHS also began to take a closer look at the outside studies showing high lead levels in Flint's water. Though at least a few MDHHS employees became aware of an increase in blood lead levels in Flint's children in July, the increase was attributed to "seasonal variation"-a summer phenomenon in which children's blood lead levels naturally increase because of more frequent exposure to lead in soil and other seasonal factors. But in September, MDHHS employees began to take a closer look. They circulated a study conducted by a pediatrician at a Flint hospital, Dr. Mona Hanna-Attisha, which showed elevated blood lead levels in children. The next day, one MDHHS employee attempted to recreate the study but came up with different numbers. The City of Flint also issued a health advisory telling residents to flush pipes and install filters to prevent lead *946 poisoning. On October 1, 2015, the MDHHS officially confirmed Dr. Hanna-Attisha's results.
Finally, on October 16, 2015, Flint reconnected to the DWSD. Two days later, MDEQ Director Daniel Wyant admitted to Michigan's governor that MDEQ "staff made a mistake while working with the City of Flint. Simply stated, staff employed a federal (corrosion control) treatment protocol they believed was appropriate, and it was not." Several MDEQ employees subsequently resigned or were suspended without pay. On January 21, 2016, the EPA issued an Emergency Order identifying the primary cause of increased lead levels in Flint's water as being a lack of corrosion control treatment after the City's switch to the Flint River.
II
To make it past qualified immunity's first prong, a plaintiff must plead facts showing that a government official violated a constitutional right. al-Kidd , 563 U.S. at 735, 131 S.Ct. 2074. Plaintiffs assert that their claim falls under the fundamental right to bodily integrity, a right guaranteed by the substantive component of the Fourteenth Amendment's Due Process Clause. Albright v. Oliver , 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). We measure whether the deprivation of a right to bodily integrity-or any other substantive-due-process right-actually occurred by determining whether a defendant's alleged conduct was so heinous and arbitrary that it can fairly be said to "shock the conscience." Lillard v. Shelby Cty. Bd. of Educ. , 76 F.3d 716, 725 (6th Cir. 1996). At times we have treated these two elements (deprivation of a constitutional right and conscience-shocking behavior) as separate methods of stating a substantive-due-process claim. Range v. Douglas , 763 F.3d 573, 588 (6th Cir. 2014). At other times we have concluded they are both required. See Am. Express Travel Related Servs. Co., Inc. v. Kentucky , 641 F.3d 685, 688 (6th Cir. 2011). But whether these are two separate methods of establishing a substantive-due-process violation or are two required elements of doing so does not change the outcome in this case. Plaintiffs' allegations show neither conscience-shocking conduct nor the violation of a fundamental right.
To demonstrate why, I turn back to the allegations in plaintiffs' complaint. The complaint is particularly important here, because substantive due process is an undefined area where "guideposts for responsible decisionmaking ... are scarce and open-ended" and "judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." Collins v. City of Harker Heights , 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). We must, therefore, "focus on the allegations in the complaint to determine how [plaintiffs'] describe[ ] the constitutional right at stake and what [defendants] allegedly did to deprive [plaintiffs] of that right." Id. The majority pays lip service to that command but abandons it in the analysis. Although the majority describes the bodily integrity right at stake as the right to be free from a government official "knowingly and intentionally introducing life-threatening substances into individuals without their consent," the right plaintiffs allege was violated is altogether different.
Plaintiffs' complaint specifically states: "In providing Plaintiffs with contaminated water, and/or causing Plaintiffs to consume that water, Defendants violated Plaintiffs' right to bodily integrity, insofar as Defendants failed to protect Plaintiffs from a foreseeable risk of harm from the exposure to lead contaminated water." That claim makes clear where defendants allegedly went wrong. It was not in knowingly introducing life-threatening substances *947 into plaintiffs' bodies against their will; it was in allegedly "fail[ing] to protect plaintiffs from a foreseeable risk of harm from the exposure to lead contaminated water " (emphasis added).
And that claim, as framed by plaintiffs, immediately encounters two roadblocks to establishing a due process violation: (1) a policymaker's or regulator's unwise decisions and statements or failures to protect the public are typically not considered conscience-shocking conduct, and (2) the Due Process Clause does not generally guarantee a bodily integrity right against exposure to contaminated water or other types of environmental harms. These two roadblocks raise serious doubts about whether plaintiffs meet the first prong of the qualified immunity analysis. I review each of these problems with plaintiffs' claim in turn, starting first with whether defendants' alleged conduct rises to the conscience-shocking level.
A
The first roadblock to plaintiffs' due process claim is that the conduct alleged fails to meet the "high" conscience-shocking standard. Range , 763 F.3d at 589. Plaintiffs' "failure to protect from foreseeable harm" theory sounds in classic negligence. But negligence-even gross negligence-does not implicate the Due Process Clause's protections. Daniels v. Williams , 474 U.S. 327, 331-33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). "The Due Process Clause 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society[.]' " Collins , 503 U.S. at 128, 112 S.Ct. 1061 (citation omitted). Rather, it serves to limit the government from using its power as an "instrument of oppression." DeShaney v. Winnebago Cty. Dep't. of Soc. Servs. , 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (citation omitted). Accordingly, substantive due process is implicated only by government actions (and sometimes failures to act) that are "so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that [they] amount[ ] to a brutal and inhumane abuse of official power literally shocking to the conscience." Lillard , 76 F.3d at 725 (citation omitted). Normally, meeting that standard requires plaintiffs to show an intent to injure through some affirmative act, but, depending on the context, even a deliberately indifferent failure to act may constitute conscience-shocking behavior. Cty. of Sacramento v. Lewis , 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). In the context of a non-custodial case such as this one, to show conscience-shocking behavior based on deliberate indifference, a plaintiff must show something akin to "callous disregard or intent to injure." Schroder v. City of Fort Thomas , 412 F.3d 724, 730 (6th Cir. 2005) (citing Lewis , 523 U.S. at 846, 118 S.Ct. 1708 ); see also Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ. , 542 F.3d 529, 538 (6th Cir. 2008) ("[I]n order to succeed on a § 1983 claim in a non-custodial setting, a plaintiff must prove either intentional injury or 'arbitrary conduct intentionally designed to punish someone[.]' " (citation and emphasis omitted) ).
In all cases, we are required to perform an "exact analysis of the circumstances before" condemning "any abuse of power ... as conscience shocking." Lewis , 523 U.S. at 850, 118 S.Ct. 1708. The majority eschews that requirement. Instead of reviewing the defendant-specific allegations in context, it cherry-picks a few "examples" from plaintiffs' complaint and strings them together to form a narrative not told by plaintiffs. In compounding that error, the majority draws inconsistent, even contradictory, conclusions about the level of culpability the allegations entail. In one breath, the majority says plaintiffs plausibly allege that defendants "knowingly and *948 intentionally introduc[ed] life-threatening substances into individuals without their consent." But in another breath, it says "[t]here is no allegation defendants intended to harm Flint residents." In yet another, the majority says defendants "systematically contaminate[d]" the Flint community. I will leave it to the reader to reconcile how conduct may constitute a knowing, intentional, and systematic attempt to contaminate another without also being motivated by an intent to harm that person. I, for one, fail to follow that logic. It is only by this imprecise analysis that the majority concludes these defendants acted in a conscience-shocking manner.
A more exact, defendant-specific analysis shows otherwise. The following analysis reveals that plaintiffs do not allege the additional "callous disregard or intent to injure" element that applies to non-custodial deliberate-indifference claims. I review the allegations against Flint's Emergency Managers (Darnell Earley and Gerald Ambrose),[2] Flint's Department of Public Works Director (Howard Croft), and the MDEQ employees (Liane Shekter-Smith, Stephen Busch, Michael Prysby, and Bradley Wurfel) in turn. Additionally, I explain why I agree with the majority that the case against the MDHHS executives and employees (Nick Lyon, Eden Wells, Nancy Peeler, and Robert Scott) and the MDEQ Director (Daniel Wyant) must be dismissed.
1
Flint Emergency Managers Darnell Earley and Gerald Ambrose. First, consider plaintiffs' allegations against Emergency Managers Earley and Ambrose. According to plaintiffs, Earley "rushed" the switch to the Flint River to meet a "self-imposed" and "aggressive" deadline as a cost-saving measure without ensuring the water treatment plant was adequately equipped to treat the water. Ambrose later rejected opportunities to return to the DWSD despite residents' complaints and other evidence pointing to the water's high corrosivity. The majority concludes that both Emergency Managers approved the initial and ongoing use of the Flint River as a water source despite knowing the City's water treatment plant was not equipped to treat the water. Not so.
Consider the Emergency Managers' decisions in context, starting with the initial switch under Earley's leadership. Recall that before the switch, the City consulted with the Lockwood engineering firm to ready its treatment plant. The engineering firm did not advise the City to implement corrosion control. Neither did the MDEQ. In fact, the MDEQ informed the City that it was "satisfied with the water treatment plant's ability to treat water from the Flint River." And although the MDEQ noted that the KWA was "a higher quality source [of] water" than the Flint River, it never indicated that use of the Flint River would place residents at risk of lead contamination. Fast-forward to early 2015, when Ambrose rejected two opportunities to reconnect to the DWSD. At that time, the City had hired the Veolia engineering firm to review its water quality and treatment procedures. After a 160-hour assessment, Veolia concluded that Flint's water complied with applicable laws and did not advise Flint to use corrosion control.
The Emergency Managers' reliance on expert advice does not demonstrate a callous *949 disregard for or intent to injure plaintiffs. Earley and Ambrose were budget specialists, not water treatment experts. They did not oversee the day-to-day operations of the water treatment plant, nor did they carry any responsibility for ensuring its compliance with federal or state laws. Accordingly, their reliance on the industry and regulatory experts who were tasked with preparing the water treatment and ensuring its compliance with safe drinking water laws does not demonstrate conscience-shocking behavior.
The majority, with the luxury of hindsight, believes that whether Earley or Ambrose reasonably relied on the opinions of the MDEQ or professional engineering firms is better left for summary judgment. But that belief suggests that the Due Process Clause may obligate managers of a municipal budget or other government officials to reject the advice of industry and regulatory experts based on the risk that those experts are wrong. Such a conclusion cuts against the "presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." Collins , 503 U.S. at 128, 112 S.Ct. 1061. Indeed, "[i]t is in the very nature of deliberative bodies to choose between and among competing policy options, and yet a substantive due process violation does not arise whenever the government's choice prompts a known risk to come to pass." Schroder , 412 F.3d at 729. Yet under the majority's conscience-shocking analysis, a whole host of policy decisions would now be subject to constitutional review, in direct contravention of the presumption of rational regulatory decisionmaking. See, e.g. , White v. Lemacks , 183 F.3d 1253, 1258 (11th Cir. 1999) ("[W]hen governmental action or inaction reflects policy decisions about resource allocation (as is often the case), those decisions are better made 'by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.' " (quoting Collins , 503 U.S. at 129, 112 S.Ct. 1061 ) ).
Finally, the majority asserts that concluding that Ambrose and Earley were relying on experts places an inappropriately "benign construction on the factual allegations." Yet the majority cites no factual allegations supporting any other conclusion. Instead, it accepts plaintiffs' various "labels and conclusions"-for instance, that Ambrose and Earley "knew" about risks to Flint residents-as sufficient support for their claim. This cuts against the Supreme Court's directive that plaintiffs allege facts, not conclusions, to state entitlement to relief. Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The bottom line is that plaintiffs do not allege that any industry or regulatory expert informed Earley or Ambrose that the City's water treatment plant was not equipped to treat Flint River water or that the water was not being treated with corrosion control. In fact, plaintiffs allege just the opposite. Professional engineering firms and the MDEQ repeatedly affirmed that Flint's drinking water complied with applicable law. Accordingly, the Emergency Managers' approval of the plant's initial and ongoing use of the Flint River as a water source does not plausibly demonstrate callous disregard for or an intent to injure plaintiffs, let alone any effort to "systematically contaminate" the Flint community.
2
MDEQ employees Liane Shekter-Smith, Stephen Busch, Michael Prysby, and Bradley Wurfel. Next consider the claims against the various MDEQ employees. Plaintiffs contend that every MDEQ employee misinterpreted the Lead and Copper Rule. Under the MDEQ's erroneous *950 interpretation of the Rule, the City could begin distributing Flint River water to residents and then conduct two six-month rounds of lead testing before treating the water with corrosion control. Without immediate treatment, the water accumulated lead as it flowed through the City's pipes. And over time, plaintiffs' drinking water became contaminated with allegedly unhealthy levels of lead. Plaintiffs equate the MDEQ's misinterpretation of the Lead and Copper Rule's corrosion-control requirements with conscience-shocking behavior that caused plaintiffs' exposure to lead.
As gravely erroneous as the MDEQ's interpretation of the Rule appears in hindsight, however, there is no legal support for the conclusion that it amounted to conscience-shocking conduct. On the contrary, a mistake of law is the classic type of conduct that qualified immunity protects from suit. Pearson v. Callahan , 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' " (citation omitted) ); Gavitt v. Born , 835 F.3d 623, 640-41 (6th Cir. 2016). That should end the case against these defendants.
The majority concludes, however, that the MDEQ's misinterpretation may have been intentional. According to the majority, plaintiffs' allegations present the "bleak[ ]" possibility that the MDEQ may have used Flint residents as "guinea pigs" to test lead-compliance theories unsupported by the law. None of plaintiffs' factual allegations make that inference a reasonable one. This is not a conspiracy case. Plaintiffs do not assert that the MDEQ employees maliciously agreed to a certain incorrect interpretation of the Lead and Copper Rule to exempt Flint from using corrosion control. And it is implausible that each MDEQ employee individually set out to advance the same incorrect interpretation of the Rule just to save the City money. Indeed, plaintiffs do not allege that any MDEQ employee intentionally misled Flint about the Rule's requirements. Instead, plaintiffs' allege that the MDEQ provided misguided advice rooted in mistaken interpretations of law-the type of conduct that, though it led to extremely unfortunate consequences here, is classically entitled to protection from suit under the doctrine of qualified immunity.
Still, the majority takes plaintiffs' allegations a step further, making the sweeping assertion that the MDEQ employees "created" the Flint Water Crisis by knowingly approving distribution of Flint River water with the use of an ill-prepared water treatment plant and then deceiving the public about the consequences of that decision. The allegations do not support that theory, however.
First, plaintiffs do not allege facts showing that Shekter-Smith, Busch, Prysby, or Wurfel personally approved the City's use of the Flint River and the Flint water treatment plant. Rather, plaintiffs say that the decision was made by Kurtz, Flint's 2013 Emergency Manager, with approval from the State's treasurer. Moreover, plaintiffs fail to allege that any of these MDEQ employees knew that the Flint water treatment plant was incapable of treating Flint River water. To be sure, plaintiffs allege that "all Defendants" were aware of a 2011 "feasibility report" rejecting the use of the Flint River at the time because of costs associated with bringing the treatment plant in compliance with "applicable standards." But plaintiffs provide no further context surrounding the report's creation and who knew about its contents. On the other hand, plaintiffs allege that, prior to the switch, Flint's Utilities Administrator told Prysby and Busch *951 that the water treatment plant had "developed a system of redundant electrical systems, treatment processes and adequate finished water storage" after consulting with the MDEQ and an engineering firm. And after that, Busch informed Wurfel that the MDEQ was "satisfied with the City's ability to treat water from the Flint River[.]" These allegations thus do not suggest that any MDEQ employee knew the treatment plant was actually incapable of properly treating Flint River water and approved its use anyway.
Nor do the majority's "poignant examples" of a handful of plaintiffs' allegations show an attempt by any MDEQ employee to knowingly mislead the public about Flint's alleged noncompliance with drinking water laws or to falsely assure residents of the water's safety.
Prysby. Take Prysby, an MDEQ engineer, first. The majority latches on to a single email sent from Prysby to a couple other MDEQ employees in October 2014. In it, Prysby opines that the fact that a General Motors engine-manufacturing plant stopped using Flint River water because of its corrosive nature did not mean that the water should be labeled " 'corrosive' from a public health standpoint." According to the majority, that statement shows that Prysby was more interested in spinning the water's corrosive nature as unconnected to public health instead of investigating problems with the water. But a "[n]egligent failure to investigate ... does not violate due process." Wilson v. Lawrence Cty. , 260 F.3d 946, 955 (8th Cir. 2001) (citations omitted). And no other allegation against Prysby demonstrates anything more than a failure to act-plaintiffs' remaining allegations name Prysby as merely a recipient of various emails but they do not identify any specific actions taken by him. Plaintiffs thus do not plausibly allege that Prysby created the Flint Water Crisis and then deceived the public about it.
Busch. Nor do the allegations support such a finding when it comes to Busch. The complaint references a number of Busch-authored emails, but the majority references only two internal emails exchanged between MDEQ employees and between Busch and EPA employee Del Toral. The majority concludes that Busch lied in the latter email, when he informed Del Toral in February 2015 that Flint's water treatment plant "had an optimized corrosion control program" in place, which demonstrates conscience-shocking behavior. But the complaint contains no factual allegations supporting the conclusion that Busch's statement was a lie. Flint did have a corrosion control "program" in place-a program that permitted a two-round testing period after the plant became operational and before plant administrators chose a particular method of corrosion control treatment . The MDEQ believed the Lead and Copper Rule allowed for that type of program. Even though the MDEQ was wrong, that error does not support the allegation that Busch lied to the EPA about the existence of a corrosion control program. Moreover, plaintiffs do not allege that Busch personally knew that Flint was distributing water without corrosion control treatment until April 2015. So even if Busch meant "treatment" when he said "program" in the February email, the factual allegations do not support the conclusion that he knew the statement was false. In sum, neither that statement nor the various other internal emails in which Busch expressed support for the MDEQ's interpretation of the Lead and Copper Rule or his belief that the water treatment plant was capable of treating Flint River water plausibly demonstrate that Busch created the Flint Water Crisis and then attempted to deceive the public.
*952 Shekter-Smith. The allegations likewise fail to demonstrate that Shekter-Smith acted in a conscience-shocking manner. The majority focuses on two of Shekter-Smith's emails.
In the first, Shekter-Smith requested that an EPA official indicate his agreement "that the city [was] in compliance with the lead and copper rule." That, she explained, would help the MDEQ "distinguish between [its] goals to address important public health issues separately from the compliance requirements of the actual rule[.]" The majority's take on that email is that Shekter-Smith cared more about "technical compliance" with the Lead and Copper than addressing an urgent health crisis. Whatever weight Shekter-Smith actually assigned each of those concerns, all that her email exhibits is an attempt to address them separately. This is hardly conscience-shocking conduct.
In the second email, Shekter-Smith responded to a question from Jon Allan, Director of the Michigan Office of the Great Lakes, about the MDEQ's statewide goals related to health-based standards. Under those goals, "98 percent of population [sic] served by community water systems" and "90 percent of the non-community water systems" would be providing "drinking water that meets all health-based standards" by 2020. Allan asked why MDEQ had any goal less than "100 percent," saying, "How many Flints Do you intend to allow? ? ?" Shekter-Smith replied:
The balance here is between what is realistic and what is ideal. Of course, everyone wants 100 percent compliance. The reality, however is that it's impossible. It's not that we 'allow' a Flint to occur; circumstances happen. Water mains break, systems lose pressure, bacteria gets into the system, regulations change and systems that were in compliance no longer are, etc. Do we want to put goal [sic] in black and white that cannot be met but sounds good? Or do we want to establish a goal that challenges us but can actually be accomplished? Perhaps there's a middle ground?
This second email likewise shows nothing more than Shekter-Smith's concern with meeting agency goals-in this instance, goals related to the statewide administration of safe drinking water. The propriety of certain agency goals, however, falls outside the purview of the Due Process Clause. Indeed, we presume that agency goal-setting consistent with its regulatory duties takes into account "competing social, political, and economic forces" of which judges do not have full view. Collins , 503 U.S. at 128, 112 S.Ct. 1061. In this instance, Shekter-Smith was apparently seeking to establish a goal that could "actually be accomplished." That concern is not conscience-shocking, regardless of how it sounds in view of what happened in Flint. These two emails, in short, do not demonstrate that Shekter-Smith created the Flint Water Crisis and subsequently attempted to deceive the public.
Wurfel. Of all the MDEQ employees, the majority's intentional-public-deception theory really implicates only one individual: Wurfel, the Department's Director of Communications. He is the only MDEQ employee alleged to have made public statements about Flint's drinking water. The majority characterizes Wurfel's statements as attempts to demean, belittle, and aggressively dampen challenges to the government's assertion that Flint's drinking water was safe. But however his statements may be characterized, they were not conscience-shocking.
His first statement came in July 2015, after a reporter broke a story claiming that there was lead in Flint's drinking water. Wurfel publicly responded by saying *953 that "anyone who is concerned about lead in the drinking water in Flint can relax." Then, in September 2015, after two doctors released separate reports about studies showing unsafe levels of lead in Flint residents' water, Wurfel placed the blame for the lead on the service lines in residents' homes even though there was, according to plaintiffs, evidence that at least some residents' service lines were plastic. Wurfel later called the doctors' testing results "perplex[ing]," explaining that they did not match the City's testing results, which he asserted were "done according to state and federal sampling guidelines and analyzed by certified labs." On two other occasions in September, Wurfel asserted the doctors' studies were inaccurate.
Though plaintiffs assert Wurfel's statements were knowing lies, their factual allegations do not support that conclusion. See Twombly , 550 U.S. at 555, 127 S.Ct. 1955. As plaintiffs' complaint alleges, Wurfel made his public statements after other MDEQ employees represented both that Flint's water treatment plant was prepared to treat Flint River water and that Flint's water testing results showed Flint was in compliance with the requirements of the Lead and Copper Rule. The allegations do not show that Wurfel was given contrary information by any City or State official. Accordingly, plaintiffs do not demonstrate that Wurfel intentionally attempted to deceive the public about the safety of Flint's drinking water or the City's compliance with drinking water laws. At most, they show a mistake of law or fact, made at least in partial reliance on the representations of other State employees. It is certainly unfortunate that Wurfel announced those mistaken beliefs to the public. But that he did so does not strip him of the protection of qualified immunity. Pearson , 555 U.S. at 231, 129 S.Ct. 808. Wurfel's handful of statements in July and September do not evince a knowing and intentional attempt to deceive the public about known deficiencies in Flint's water treatment procedures or any conduct designed to intentionally contaminate the public.
The allegations against the MDEQ employees, in sum, do not plausibly demonstrate a callous disregard for or intent to injure plaintiffs, let alone any effort to "systematically contaminate" the Flint community. What they show instead is a series of internal emails and a handful of public statements regarding the requirements of the Lead and Copper Rule and the water's safety. Even if the MDEQ employees made mistakes in interpreting the Rule, those mistakes are not conscience-shocking.[3]
3
Flint Director of Department of Public Works, Howard Croft. Next, I turn to the allegations against Croft, which come nowhere near the high conscience-shocking standard. Plaintiffs assert that Croft "caused and allowed unsafe water to be delivered to Flint's residents," but they fail *954 to allege that Croft was actually involved in the City's decision to use to the Flint River as a water source or that he played any part in determining whether and when the treatment plant would use corrosion control. The majority finds that single, conclusory allegation sufficient to make the plausible inference that Croft played an affirmative role in approving the transition to the Flint River. What makes that conclusion especially confounding is the majority's simultaneous rejection of allegations against other defendants that are just as conclusory as this one. For example, the majority finds that plaintiffs' allegation that MDHHS executive Nick Lyon "participated in, directed, and/or oversaw the department's efforts to hide information to save face, and to obstruct and discredit the efforts of outside researchers" as the kind of "bare" and "chimerical" assertions Iqbal mandates be set aside. But the allegation that Croft "caused and allowed unsafe water to be delivered to Flint's residents" is not any more detailed than the "chimerical" assertion against Lyon. There are only two other allegations against Croft. The first is that, at an unidentified point in time, he said in a press release that the City's water was "of the high quality that Flint customers have come to expect." The second is that in September 2015, he emailed "numerous officials" to inform them that the MDEQ had confirmed Flint's compliance with "EPA standards." These allegations do not demonstrate that Croft engaged in any behavior that may fairly be construed as conscience-shocking.
4
MDHHS executives Nick Lyon and Eden Wells; MDHHS employees Nancy Peeler and Robert Scott; and MDEQ Director Daniel Wyant. Finally, a brief word about the MDHHS executives, the MDHHS employees, and MDEQ Director Wyant, all of whom the majority correctly dismisses from this case. I agree with the majority that most of the allegations against the MDHHS executives and employees have to do with negligence (i.e., failing to timely notify the public of the possibility of increased lead in the water) rather than any affirmative action involving them in the decision to use the Flint River as a water source without simultaneously implementing corrosion control treatment. I agree as well that once those allegations are discarded, plaintiffs' remaining allegations-going to these defendants' attempts to "discredit" studies from outside sources-are too sparse to demonstrate conduct rising to the level of conscience-shocking.
And as to MDEQ Director Wyant, I concur with the majority's conclusion that none of plaintiffs' allegations show that he was personally involved with the decision to use the Flint River as a water source or otherwise engaged in any conscience-shocking behavior.
Accordingly, I join the majority in concluding that plaintiffs fail to allege that these defendants engaged in conscience-shocking behavior or otherwise infringed on plaintiffs' due process rights.
For all of these reasons, I do not believe plaintiffs' allegations suggest that any individual defendant's actions or failures to act shock the conscience. This presents a significant roadblock that seems to prevent plaintiffs from establishing a violation of substantive due process and thus proceeding past the first prong of the qualified-immunity analysis.
B
The second roadblock to plaintiffs' substantive-due-process claim-which also suggests they cannot proceed past qualified immunity's first prong-is that their claim does not appear to arise from the deprivation of a recognized fundamental right to bodily integrity. As should be clear *955 by now, the right reconstructed by the majority is entirely distinct from the one asserted in plaintiffs' complaint and is thus, unsurprisingly, devoid of support from plaintiffs' factual allegations.
So what is the bodily integrity right plaintiffs allege? According to the complaint, defendants' alleged conduct amounted to a failure to protect from exposure to lead-contaminated water. But although plaintiffs frame the claim that way in their complaint, they insist their claim does not flow from a right to receive clean water. Plaintiffs are right to avoid advancing that theory because the Due Process Clause guarantees neither a right to live in a contaminant-free environment, Collins , 503 U.S. at 125-26, 112 S.Ct. 1061, nor a fundamental right to water service. In re City of Detroit , 841 F.3d 684, 700 (6th Cir. 2016) (quoting Golden v. City of Columbus , 404 F.3d 950, 960 (6th Cir. 2005) ). Still, it is hard to understand plaintiffs' claim independent from the right to receive clean water. If the Constitution does not guarantee the right to receive clean water on the one hand, how may it guarantee the right not to be exposed to contaminated water on the other?
The majority avoids grappling with that issue by turning, inappropriately, to abstract concepts of personal autonomy and informed consent that it divines from several inapposite cases. In so doing, the majority's analysis runs contrary to the "restrained methodology" outlined by the Supreme Court in Washington v. Glucksberg , 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). To apply that methodology, we look to "concrete examples involving fundamental rights found to be deeply rooted in our legal tradition." Id. at 722, 117 S.Ct. 2258. Those examples reveal the "outlines of the 'liberty' [interests] specially protected by the Fourteenth Amendment[.]" Id. Because the Due Process Clause's substantive component protects only those rights that are an integral part of our "Nation's history and tradition," courts "have always been reluctant to expand" the Clause's coverage into new territory. Id. at 720-21, 117 S.Ct. 2258. Looking to concrete examples regarding what those historic rights are "tends to rein in the subjective elements that are necessarily present in due-process judicial review." Id. at 720, 722, 117 S.Ct. 2258.
In Glucksberg , the Court showed us how to use that "restrained methodology." There, the Supreme Court dismissed a claim by state physicians that the Due Process Clause guaranteed a right to physician-assisted suicide. Id. at 721-24, 117 S.Ct. 2258. The physicians argued that recognizing such a right would be consistent with the "self-sovereignty" principles underlying a person's interest in choosing between life and death, which were articulated in Cruzan v. Missouri Department of Health , 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Id. at 723-24, 117 S.Ct. 2258. In rejecting that argument, the Glucksberg Court clarified that Cruzan assumed, though did not definitively decide, that a competent person had a right to refuse unwanted lifesaving medical treatment. Id. at 720, 117 S.Ct. 2258. That assumption, however, "was not simply deduced from abstract concepts of personal autonomy." Id. at 725, 117 S.Ct. 2258. It instead arose from the "common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment[.]" Id. The specific right to physician-assisted suicide found no support in the examples outlined in the Court's jurisprudence or in our Nation's history or traditions and was therefore not protected by substantive due process. Id. at 723-24, 117 S.Ct. 2258.
Likewise, no concrete examples arising from the established bodily integrity jurisprudence *956 or from our Nation's history or traditions support the right asserted here-protection from policy or regulatory decisions or public statements that, somewhere down the line, result in exposure to contaminated water.
We have previously interpreted the bodily integrity right as "the right against forcible physical intrusions of the body by the government." Planned Parenthood Sw. Ohio Region v. DeWine , 696 F.3d 490, 506 (6th Cir. 2012) (citations omitted). The right is outlined most explicitly in Rochin v. California , 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). There, the Court held that the Due Process Clause prohibits a state from securing evidence in support of a conviction by using a vomit-inducing solution to forcibly extract the evidence from a suspect's stomach. Id. at 172-74, 72 S.Ct. 205. That intrusion on an individual's body, the Court explained, was "too close to the rack and the screw" to be constitutionally permissible. Id. at 172, 72 S.Ct. 205. Since then, the Court has concluded that similar types of physically intrusive law enforcement searches implicate the right to bodily integrity. Those include a "compelled physical intrusion beneath [a suspect's] skin and into [the] veins to obtain a" blood sample, Missouri v. McNeely , 569 U.S. 141, 148, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), and a nonconsensual surgery to retrieve a bullet from a suspect's chest. Winston v. Lee , 470 U.S. 753, 767, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). In this Circuit, we have concluded that obtaining evidence by "anally prob[ing]" an individual "without his consent" when he was "naked and handcuffed, ... paralyzed, [and] intubated" was such a grave bodily integrity violation that it rendered the Fourth Amendment search unreasonable. United States v. Booker , 728 F.3d 535, 537, 547 (6th Cir. 2013) (citation omitted).
In the medical context, too, the Court has underscored the right's guarantee against direct, physical intrusions into an individual's body at the hands of a government official. In Washington v. Harper , for instance, the Court emphasized the significance of an inmate's "liberty interest in avoiding the unwanted administration of antipsychotic drugs." 494 U.S. 210, 221, 223, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). Riggins v. Nevada , 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) affirmed the magnitude of that liberty interest-avoiding the unwanted administration of drugs-for pretrial detainees as well. Later, in Cruzan , the Court explained that the general principles underlying Harper and Riggins suggested that "a competent person [has] a constitutionally protected right to refuse lifesaving hydration and nutrition." 497 U.S. at 280, 110 S.Ct. 2841 ; Glucksberg , 521 U.S. at 720, 117 S.Ct. 2258 (explaining that Cruzan "assumed, and strongly suggested, that the Due Process Clause protects" such a right without expressly concluding that it did (citing Cruzan, 497 U.S. at 278-79, 110 S.Ct. 2841 ) ). In the same vein, cases from the Supreme Court and our Circuit suggest that the right to bodily integrity is implicated by government interference with a woman's right to obtain an abortion. See id. at 726-27, 117 S.Ct. 2258 ; Planned Parenthood Sw. Ohio Region , 696 F.3d at 507.
These cases delineate the contours of the right to bodily integrity in terms of intrusive searches or forced medication. None of them is compatible with the "careful description" of the right at issue here: protection from exposure to lead-contaminated water allegedly caused by policy or regulatory decisions or statements.[4] Even the few district court or sister *957 circuit cases cited by the majority do not clarify the contours of plaintiffs' alleged right. All except one of those cases deal with medical professionals performing government-sponsored invasive procedures or harmful experiments on unsuspecting patients.[5] The last one deals with police officers who coerced individuals to ingest marijuana while those individuals were under the officer's control.[6] So those cases further elaborate the ways in which medical or law enforcement personnel may interfere with an individual's right to bodily integrity. But they say nothing about how non-custodial policy or regulatory decisions or statements affecting the quality of an environmental resource may do so. In short, neither our Nation's history and traditions nor governing bodily integrity jurisprudence suggests that the conduct alleged here is comparable to a "forcible physical intrusion[ ] of the body by the government." Planned Parenthood Sw. Ohio Region , 696 F.3d at 506. "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it." Reno v. Flores , 507 U.S. 292, 303, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).
In sum, because the conduct alleged does not appear to rise to the level of conscience-shocking, and because I believe it does not demonstrate the deprivation of a recognized fundamental right, I have serious doubts about whether plaintiffs state a substantive due process claim sufficient to carry them past prong one of the qualified-immunity analysis.
III
The second prong of the qualified-immunity analysis looks to whether the alleged constitutional right was "clearly established" at the time the government official acted. al-Kidd , 563 U.S. at 735, 131 S.Ct. 2074. This presents the most fundamental *958 problem for plaintiffs' case. To the extent plaintiffs do successfully allege the violation of a constitutional right, the novelty of that right just shows that it was not clearly established at the time the alleged events unfolded. Therefore, the doctrine of qualified immunity shields every defendant from suit.
For a right to be clearly established, its contours must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right[.]" Mullenix v. Luna , --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (emphasis added) (quoting Reichle v. Howards , 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) ). Because "[t]he dispositive question is whether the violative nature of particular conduct is clearly established," we look to how existing precedent applies to each defendant's actions in the "specific context of the case" before us. Id. at 308 (internal quotation marks and citation omitted). Plaintiffs must be able to "identify a case with a similar fact pattern" to this one "that would have given 'fair and clear warning to officers' about what the law requires." Arrington-Bey v. City of Bedford Heights , 858 F.3d 988, 993 (6th Cir. 2017) (quoting White v. Pauly , --- U.S. ----, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) ). Identifying a factually similar case is especially important in the realm of substantive due process, where the inherent ambiguity of what the law protects is best discerned through "carefully refined ... concrete examples[.]" Glucksberg , 521 U.S. at 722, 117 S.Ct. 2258.
Here, that means plaintiffs must be able to point to controlling cases extending substantive due process protections to the following individuals:
• A high-level government executive who makes a decision (or proceeds with a project) while relying on expert opinions that the decision or project is lawful and safe (Earley and Ambrose).
• A regulator who misinterprets environmental laws and provides bad advice to government policymakers (MDEQ employees).
• A city or state regulator who, based on the erroneous advice of other regulators, publicly announces that a government-provided resource is safe for consumption when it is not (Wurfel, Croft, or others who made public statements).
As the majority acknowledges, plaintiffs point to no factually similar controlling case in which a court found that such conduct violated a constitutional right to bodily integrity. "This alone should have been an important indication to the majority that [the defendants'] conduct did not violate [plaintiffs'] 'clearly established' right." White , 137 S.Ct. at 552.
In fact, in case after case around the country, courts have consistently rejected substantive-due-process claims based on the type of conduct alleged here. Branch v. Christie is one such case. 2018 WL 337751 (D.N.J. Jan. 8, 2018). Branch dealt with a bodily integrity claim brought by parents of New Jersey public school children against several state officials for "knowingly expos[ing] the children ... to water that was contaminated with unsafe levels of lead," and "concoct[ing] a scheme to cover up the health hazard." Id. at *1. The parents said that state employees caused the lead contamination by "cancel[ling] work orders to change outdated and lead-saturated filters," and "allowing several filters to be used for upwards of five years." Id. (internal quotation marks and citation omitted). Once the public became aware of the unsafe lead levels in the school's drinking fountains, state employees "undertook a course of providing misinformation to parents, telling the community that the *959 water was safe." Id. (internal quotation marks and alterations omitted). The Branch court dismissed the parents' claims, finding "no authority" supporting their bodily integrity theory. Id. at *8. As the court explained, "[t]he liberty interest in bodily integrity guarantees the 'right generally to resist enforced medication,' the right to be 'free from medical invasion,' and the right to an abortion," but "not to guarantee ... a right to minimum levels of safety" or protection from contaminated water. Id. at *7 (citations omitted).
Here, as in Branch , government officials allegedly exposed others to water contaminated with lead. And here, as in Branch , certain government officials allegedly attempted to hide the lead contamination. The Branch court could find no authority indicating that such conduct violated a substantive due process right-not even the Supreme Court's bodily integrity cases were close to on point. That court's conclusion shows how unclear it would have been for the regulators and policymakers in this case to have anticipated that their actions might have violated an established bodily integrity right.
Coshow v. City of Escondido , a state court case, also sheds light on the novelty of plaintiffs' asserted right. 132 Cal. App. 4th 687, 34 Cal.Rptr.3d 19 (2005). There, the California Court of Appeals rejected residents' bodily integrity claims against the City of Escondido and California's Department of Health Services over their decision to add fluoride to public drinking water. Id. at 698, 34 Cal.Rptr.3d 19. The residents asserted that adding fluoride to the water exposed the public to unnecessary health risks. Id. But the court held that, just as the Constitution did not guarantee any "right to a healthful or contaminate-free environment," it likewise did not guarantee a right to receive fluoride-free drinking water from the City. Id. at 709-10, 34 Cal.Rptr.3d 19. This was so even though the fluoride might have contained "trace levels of lead and arsenic[.]" Id. at 700, 34 Cal.Rptr.3d 19. The court reasoned that the residents' claim came down to an asserted right to receive "public drinking water of a certain quality." Id. at 708-09, 34 Cal.Rptr.3d 19. And it held that the "mere novelty" of that claim indicated it was not "so rooted in the traditions and conscience of our people as to be ranked as fundamental." Id. (quoting United States v. Salerno , 481 U.S. 739, 751, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ). Accordingly, the court held that the right to fluoride-free drinking water was not protected by substantive due process. Id.
Just as in Coshow , the novelty of plaintiffs' claim here shows that it is not clearly established. The majority attempts to draw a disingenuous distinction between this case and Coshow . It reasons that, in Coshow , adding fluoride to drinking water served the beneficial purpose of preventing tooth decay while, in this case, adding lead to water served no countervailing governmental interest. I certainly do not quibble with the premise that adding lead to water furthers no discernable beneficial purpose. But that is not what happened here. No government official made a conscious decision to introduce lead into Flint's water. Instead, the Emergency Managers made a conscious and legitimate policy decision to switch to the Flint River as a water source to cut costs-and they did so in reliance on guidance from engineering firms and the MDEQ. That hardly demonstrates that the decision to switch to the Flint River was made with no countervailing governmental interest in mind. The government officials' resource-allocation decisions during a budgetary crisis did not constitute obvious violations of the right to bodily integrity because of the grave health consequences they allegedly caused in hindsight.
Moreover, that some governmental officials made public statements about the *960 safety of Flint's water does not make the unlawfulness of any defendant's conduct any more obvious. As the Second Circuit put it, "no court has ever held a government official liable for denying substantive due process by issuing press releases or making public statements"-regardless of whether the public statements were true or false. Benzman v. Whitman , 523 F.3d 119, 125, 127 (2d Cir. 2008) (rejecting residents' substantive due process claims against EPA officials for making "substantially exaggerated" statements regarding air quality after the September 11 terrorist attacks). Benzman invoked the principles underlying a similar post-September-11 case, Lombardi v. Whitman , 485 F.3d 73 (2d Cir. 2007). In Lombardi , workers who performed search, rescue, and clean-up services at the World Trade Center site in the aftermath of the terrorist attacks alleged that the EPA violated their right to bodily integrity by falsely assuring them that it would be safe to work without respiratory protection. Id. at 74. Relying on those assurances, several workers went without that protection and later suffered adverse health effects. Id. at 75. Without definitively deciding whether the alleged false assurances interfered with the workers' fundamental right to bodily integrity, the court found that they were nevertheless not conscience-shocking. Id. at 82-83. In so deciding, the court expressed concern with imposing broad constitutional liability on EPA officials for making false statements in the course of fulfilling the agency's mission. The court reasoned that "the risk of such liability will tend to inhibit EPA officials in making difficult decisions about how to disseminate information to the public in an environmental emergency." Id. at 84. Accordingly, absent any allegation of an intent to harm, the court declined to extend substantive due process to cover what was "in essence a mass tort for making inaccurate statements." Benzman , 523 F.3d at 127-28.
This case implicates similar, albeit not identical, concerns to those invoked in Lombardi and Benzman . As the majority points out, there is no allegation that any defendant here intended to harm a Flint resident. And like the EPA regulators in Lombardi and Benzman , Wurfel made public statements pursuant to his official role as MDEQ's Director of Communications. To be sure, those statements countered evidence about Flint water's lead levels presented in two separate outside studies. But they were also consistent with information provided to Wurfel by officials from his own department. That information was, in retrospect, misguided. Plaintiffs do not assert, however, that Wurfel made any knowingly false statements for the purpose of causing harm. The same goes for Croft. When he issued a press release asserting that Flint's water was of a "high quality," at least one engineering firm and the MDEQ had concluded that the water treatment plant was capable of adequately treating Flint's water. In other words, the allegations do not show that Croft made a knowingly false public statement for the purpose of causing harm. Given the absence of any such allegation, and because no court has ever concluded that the Due Process Clause covers the public statements of government officials, it can hardly have been apparent to Wurfel or Croft that their statements clearly violated plaintiffs' due process right to bodily integrity.
Due to the lack of controlling precedent and the many cases suggesting substantive due process does not protect plaintiffs' asserted right, the majority again falls back on its exaggerated characterization of defendant's actions and statements, likening them to the "systematic" poisoning of an entire community. Advancing that narrative, the majority concludes that this case is one of the "easy" ones that should never have arisen in the first place. See *961 United Statesv. Lanier , 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). "Of course, in an obvious case, [general] standards," (or reasoning) "can 'clearly establish' the answer, even without a body of relevant case law." Brosseau v. Haugen , 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (citation omitted). But this is not one of those cases. As already demonstrated, the majority's systematic poisoning narrative has no basis in plaintiffs' factual allegations.[7] This is not a case about a government official knowingly and intentionally introducing a known contaminant into another's body without that person's consent. It is a case about a series of erroneous and unfortunate policy and regulatory decisions and statements that, taken together, allegedly caused plaintiffs to be exposed to contaminated water.
The proper framing of the factual narrative exposes how far off base are the bodily integrity cases relied upon by the majority. How could those cases have provided any practical guidance to government officials like Earley, Ambrose, Croft, or the MDEQ employees? For instance, how should Rochin 's prohibition against induced vomiting to obtain evidence have informed Earley's oversight of the switch from the DWSD to the Flint River and what professional opinions he was entitled to rely upon when the City made the switch? And how should it have informed Ambrose's decision to continue using the Flint River as a water source and what professional opinions he was entitled to rely upon in doing so? What about the MDEQ employees? How should Riggins 's limits on the state's ability to administer antipsychotic drugs to pretrial detainees have changed what kind of advice the MDEQ employees gave the City about federal corrosion-control requirements? Or what about the fact that Cruzan allows a state to demand clear and convincing evidence that an incompetent patient no longer desires life support before cutting it off? How should that have influenced the content of Wurfel's (or any other defendant's) public statements about the water's quality? The answer to these questions is-clearly-not established.
And although the right plaintiffs allege is not established, various courts have certainly considered it-and rejected it. See Branch, 2018 WL 337751 ; Coshow, 132 Cal. App. 4th 687, 34 Cal.Rptr.3d 19 ; Benzman, 523 F.3d 119 ; Lombardi , 485 F.3d 73.[8] But ignoring those cases, the majority *962 turns, curiously, to a few federal and state cases arising from the Flint Water Crisis itself. The majority begins its opinion with the proclamation that it joins a few decisions concluding that some of these same defendants, and some others, violated various Flint residents' substantive due process rights. Those cases offer weak support for the majority's position. Oddly, one of the decisions it cites is the very case before us on appeal, Guertin v. Michigan , 2017 WL 2418007 (E.D. Mich. June 4, 2017). The second is authored by the same judge as authored Guertin , and its bodily integrity analysis block-quotes more than 2,000 words from the Guertin analysis. In re Flint Water Cases , 329 F.Supp.3d 369, 397-400 (E.D. Mich. 2018), vacated on other grounds (Nov. 9, 2018). And that case appears to follow the same analytical errors as the state case to come before it-that is, just like the state case, it makes several logical leaps to conclude that policy and regulatory decisions and statements are on par with an intentional introduction of a contaminant into another's body. Mays v. Snyder , 323 Mich.App. 1, 916 N.W.2d 227 (2018) ; Mays v. Snyder , No. 16-000017-MM (Mich. Ct. Cl. Oct. 26, 2016). These few cases and their redundant analyses provide a weak foundation on which to build a new bodily integrity jurisprudence.
In sum, the majority's opinion is a broad expansion of substantive due process, which contradicts the traditional understanding that due process does not "supplant traditional tort law" or impose a duty on the government to ensure environmental safety. Collins , 503 U.S. at 126, 112 S.Ct. 1061 (citation omitted). What is more, it effectively "convert[s] the rule of qualified immunity ... into a rule of virtually unqualified liability" for government officials making policy or regulatory decisions or statements that have any effect on a publicly consumed environmental resource. White , 137 S.Ct. at 552 (ellipses in original) (citation omitted). That turns qualified immunity on its head.
IV
The majority's conclusion that the defendants violated plaintiffs' clearly established right to bodily integrity has some facial appeal, of course, because we sympathize with the Flint residents' plight. It is wrong, however, on both the facts and the law. For all of the above reasons, I join the majority in its denial of sovereign immunity to the City of Flint and in dismissing various defendants from the case. But I dissent from its denial of qualified immunity *963 to Earley, Ambrose, Croft, Shekter-Smith, Busch, Prysby, and Wurfel.

It is unclear whether the "one hundred and sixty lead tests" were part of the "160-hour assessment" that Veolia conducted in early 2015 as part of its review of the City's water treatment plant.

Plaintiffs also bring a claim against the City of Flint, which necessarily rises and falls with their claim against the Emergency Managers. Because the Emergency Managers were acting on behalf of the City, their policy decisions concerning the source of the City's water were also policy decisions of the City. Accordingly, plaintiffs' claim implicates the City only to the extent the Emergency Managers' decisions were unconstitutional.

Rather than viewing plaintiffs' allegations in a light most favorable to defendants, all this conclusion does is hold plaintiffs to their burden of presenting factual allegations that provide a plausible basis for their claim. Twombly , 550 U.S. at 555, 127 S.Ct. 1955. Plaintiffs do not provide any factual allegations supporting the conclusion that the MDEQ's interpretations were more than mistakes. According to the majority, plaintiffs allege that Shekter-Smith, Busch, and Prysby knew Flint was not in compliance with applicable law because EPA employee Del Toral made that clear in a memorandum that these defendants "ignored and dismissed." But while that memorandum allegedly expressed "concern[ ]" with Flint's lack of corrosion control and water testing methods, it did not conclude that Flint was in violation of the Lead and Copper Rule. Plaintiffs do not allege that Del Toral or any other EPA official informed the MDEQ that Flint was flouting federal drinking water requirements.

Even In re Cincinnati Radiation Litigation , 874 F.Supp. 796 (S.D. Ohio 1995), the one district court case the majority finds "especially analogous," fails to close the gap. There, the court concluded that government officials violated medical patients' right to bodily integrity by devising a program that subjected unwitting cancer patients to high doses of radiation under the guise of performing cancer treatment. Id. at 803-04. But whether the Due Process Clause protects hospital patients from being intentionally subjected to harmful medical treatment without their consent is not the determinative issue here. What we should care about is whether and when it protects an indeterminate number of public citizens from certain regulatory decisions or statements that have some impact on the quality of public drinking water or any other environmental resource.

Barrett v. United States , 798 F.2d 565 (2d Cir. 1986) (state psychiatric hospital administered injections of a synthetic mescaline compound furnished by the Unites States as part of an experimental program that tested the suitability of the substance as a chemical warfare agent); Lojuk v. Quandt , 706 F.2d 1456 (7th Cir. 1983) (Veterans Affairs psychiatrist subjected patient to electroconvulsive therapy without the patient's consent); Rogers v. Okin , 634 F.2d 650 (1st Cir. 1980), overruled on other grounds sub nom , Mills v. Rogers , 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982) (state administered antipsychotic drugs to both voluntary and involuntary patients at state mental health facilities); Heinrich v. Sweet , 62 F.Supp.2d 282 (D. Mass. 1999) (U.S. Government conspired with health institutions to conduct "extensive, unproven and dangerous medical experiments on over 140 terminally ill patients, without their knowledge or consent"); Stadt v. Univ. of Rochester , 921 F.Supp. 1023 (W.D.N.Y. 1996) (government physicians injected patient with plutonium without her knowledge or consent); In re Cincinnati Radiation Litigation , 874 F.Supp. 796 (S.D. Ohio 1995) (government and university physicians subjected cancer patients to radiation experiments without their knowledge under the guise that they were receiving cancer treatment); Davis v. Hubbard , 506 F.Supp. 915 (N.D. Ohio 1980) (inadequate medical treatment).

Bounds v. Hanneman , 2014 WL 1303715 (D. Minn. Mar. 31, 2014) (officers forced plaintiffs to ingest a substantial amount of marijuana, against their will, in order to observe how they would react).

What is more, the majority's exaggerated narrative runs contrary to what is publicly known in the aftermath of the Flint Water Crisis. For instance, plaintiffs point out that the state has brought criminal charges against various defendants and ask us to take judicial notice of those charges as providing context for their bodily integrity claim. Of course, I agree with the majority that it is inappropriate to consider those charges for the purpose of deciding plaintiffs' constitutional claim. But I note that even if it were appropriate to consider them, the charges would not support plaintiffs' assertion that defendants' conduct is so obviously unlawful that qualified immunity does not shield them from plaintiffs § 1983 suit. In fact, they prove just the opposite. If the defendants' actions are obviously unlawful, then one would expect relatively speedy probable-cause determinations. Reality suggests otherwise. Consider this: the state issued its complaint against Lyon on June 14, 2017, but the court did not find probable cause to bind him over for trial until August 24, 2018. In the meantime, the trial judge spent around 11 months on preliminary examinations just to find probable cause existed. Other defendants, such as MDEQ Employee Shekter-Smith and MDHHS Executive Peeler, have not even been bound over yet, despite the state filing complaints against them as early as July 2016. These cases have languished unusually long in probable cause proceedings. That alone suggests that the egregiousness of defendants' actions is not so apparent as the majority makes it out to be.

The number of cases rejecting similar environmentally based claims is significant. See Kaucher v. Cty. of Bucks , 455 F.3d 418, 420, 428-30 (3d Cir. 2006) (rejecting a substantive-due-process claim by corrections officials who contracted a disease allegedly due to the jail's unsanitary conditions and provision of false and misleading information about the extent of the sanitary problem); Walker v. City of E. Chicago , No. 2:16-cv-367, 2017 WL 4340259, at *6 (N.D. Ind. Sept. 29, 2017) (rejecting a substantive-due-process claim that the government allowed a housing authority to "build and operate public housing in an area with contaminated soil, thus increasing their risk of injury"); In re Camp Lejeune N. Carolina Water Contamination Litig. , 263 F.Supp.3d 1318, 1325, 1359 (N.D. Ga. 2016) (rejecting a substantive-due-process claim by service members against government officials at the Marine base where they lived based on the officials' failure to monitor water quality and notify service members of the presence of toxic substances in the water); Naperville Smart Meter Awareness v. City of Naperville , 69 F.Supp.3d 830, 839 (N.D. Ill. 2014) (rejecting a substantive-due-process claim by residents of a city asserting that radio frequency waves emitted by "smart meters" that the city installed in their homes posed health risks); J.S. ex rel. Simpson v. Thorsen , 766 F.Supp.2d 695, 712 (E.D. Va. 2011) (rejecting a substantive-due-process claim brought by an elementary student that school officials knowingly concealed the school's mold problems to the detriment of the student's health).